SELTZER, et v STATE ex READ

Ohio Appeals, 8th Dist, Cuyahoga Co
No 10385.  Decided March 6, 1930

Baker, Hostetler and Sidlo, Cleveland, for Seltzer, et.

VICKERY, PJ.

We approach the solution of the question involved in this case with considerable diffidence and hesitancy for, in order to protect the dignity and standing of a court, there must reside in the court the power to punish summarily for contempt committed within certain bounds, either in the court room itself or so near to the court room that it obstructs the administration of justice and it is necessary that a judge should have this power and, in such case, to sit himself, even though the contempt is directed against **him;** but usually those cases come within the immediate knowledge of the court and, without any information being filed, the court is fully cognizant of the matter and can summarily try and punish the offender. We have said this because there seems to have been a rumor abroad that in the instant case the Judge had exceded his powers in sitting in the case at bar and finding the parties guilty of contempt against himself. We do not think that the court exceeded his **power** in sitting in this case even though it was necessary to have an information filed before the parties could be charged with contempt but, inasmuch as it was necessary that written charges be filed, it would have been in much better **taste** and more in accordance with the present trend of public opinion and judicial decisions, to have referred the matter to another judge, and Judge Walther then could have been a witness against the men charged with the contempt, and the decision would be thus unswayed by personal feelings, passion or prejudice. We think the ends of justice would be better served if judges would recognize this more clearly and refer matters of contempt other than those committed in their immediate presence to another judge for trial, and we hope that, in the interest of protecting the right of a judge to hear and punish summarily contempts committed in the immediate presence of the judge, judges will refer such contempts as those involved in the instant case to other judges, so that the court will not bring itself into disrepute by sitting in judgment in a case in which it is vitally interested. In the instant case we think that Judge Walther did not exceed his powers, but that it was a matter of bad taste to sit in the case.

Having cleared away the premises, let us state that this action of contempt grew out of three editorials which appeared in three several issues of The Cleveland Press, a newspaper published and in general circulation in Cleveland, on the 11th day of July, 1929. The editorials are as follows:

"IF THIS BE CONTEMPT OF COURT

Sheriff, this racing mess is a 'dreadful thing.' You never said truer words.

You probably understand now what has happened. It is perfectly clear to us what has happened.

This is it.

The interests which forced you to rescind your statement that you would appoint a commission to clean up racing, are the same interests which are behind Thistledown.

x x x x x x x x x x

They had, as you now know, a judge up their sleeve who would do their bidding. They had that ace in the hole.

x x x x x x x x x x

Then comes the judge, Frederick P. Walther, who has long taken orders from the interests which wanted Thistledown to continue.

This judge issues the most monstrous injunction order which has been put out from the bench in Cuyahoga county in our time.

He enjoins the sheriff of this county from doing his sworn duty of enforcing the law. If any act of a judge can drive him from the bench, this act of Walther's should do it.

If this injunction can be sustained, almost any injunction to restrain an officer of the law from doing his duty can be sustained.

Almost any bootlegger, gambler, divekeeper, or what not, can get an injunction to keep the arresting officers from his door.

Of course, it won't stand. Walther knows it, if he knows any law at all. The Thistledown gang knows it.

x x x x x x x x x x

(Here follows similar editorials as they appeared in later editions)

Apparently, so far as it appears in the record, Judge Walther had not seen or noticed these editorials until on the afternoon of the 11th while he was holding court in Room Fourteen, his regular room for the purpose of hearing cases, when the matter was called to his attention by a member of the Cleveland Bar, to-wit, J. Harold Read, who interrupted the proceedings in the trial of the case then being heard before Judge Walther and insisted on reading these three editorials, and he did read them in open court to Judge Walther. Whereupon, Judge Walther instructed Mr. Read to draw an information for contempt, basing it upon these editorials, which said information was drawn by Mr. Read and service was made upon four members of the staff of The Cleveland Press, to-wit, the Editor, Louis B. Seltzer, the Editorial Writer, Carlton K. Matson, and two others whom it is not necessary to further mention, inasmuch as they convinced the court that they had nothing to do with the matter, and Seltzer and Matson assumed full responsibility for the editorials; and in so far as the information against the other two was

concerned it was withdrawn and they were discharged.

After service was made upon the defendants Seltzer and Matson, and after they were arrested and brought into court, they plead not guilty. Whereupon Judge Walther appointed Wm. H. Boyd, Luther Day, John A. Cline and J. Harold Read to represent him in the trial of the action. Had Judge Walther sought, he could not have chosen a more capable set of lawyers at the Cleveland bar. Mr. Boyd however, was otherwise employed and did not accept the appointment. Mr. Day had an engagement out of town and he was excused from accepting the appointment. Mr. Cline, however, accepted the appointment, as was his duty, being a member of the Cleveland Bar and an officer of the court, as did Mr. Read, and thereupon an amended information was filed. The court in his generosity not only appointed four lawyers to represent himself, but likewise appointed Mr. Newton D. Baker, Mr. Joseph Hostetler and Mr. Thomas Sidlo of the law firm of Baker, Hostetler and Sidlo, to represent the defendants. However, all three of the gentlemen last named, inasmuch as they had been retained by the defendants, declined the appointment but, notwithstanding such declination, the appointment was permitted to stand by Judge Walther and so the record shows.

It was very lucky for the Court of Appeals that the gentlemen last named did not accept the appointment of Judge Walther because, on the eve of trial in the Court of Appeals Mr. Cline,—and we want to say in this connection that Mr. Cline's connection in this case from its inception to its determination, so far as his relations go, was lawyer-like in every respect, and also that of Mr. Read,—instructed this court by letter, notifying us that he had been instructed by Judge Walther to file no brief and not to appear in the case,— and subsequently we have received the same sort of letter from Mr. Read, although it was after the hearing in this court,—Judge Walther, I believe, stating that he deemed it unethical for him to prosecute the persons or to aid the Court of Appeals in arriving at a decision in the case,—I say, it is important to remember that Mr. Baker, Mr. Hostetler and Mr. Sidlo did not accept the appointment of Judge Walther, because had they done so, Judge Walther could have terminated their relation with this lawsuit the same as he terminated the relation of Mr. Cline and Mr. Read, and then Mr. Seltzer and Mr. Matson having been convicted would have been unable to have the assistance of the lawyers that defended them in the action below and, perhaps, the order of the court might have gone even so far as to direct the counsel for the plaintiffs in error to dismiss the petition in error and then, of course, the judgment of the court below would have stood and there would have been no help but that Mr. Seltzer and Mr. Matson should have paid Five Hundred Dollars each and have spent thirty days in jail.

We cannot quite understand how it was more unethical to present the case in a court that had no bias or prejudice in the matter and thus enable that court to arrive at a just conclusion, than it was to appoint lawyers and to sit in the trial where the Judge was the aggrieved party. But that is really aside from the purpose. However, we have heard a great many contempt cases and we never thought that it was undignified or unethical for a Common Pleas Judge, who had sat in any such case and found the parties guilty of contempt, to permit the lawyers that represented him in such a hearing to appear in the Court of Appeals, nor do I know of a case where a judge refused to let the reviewing court have the benefit of the advice and counsel of the lawyers that tried the case before him. I do know that in all courts from the lowest to the highest, to-wit, the Supreme Court of the United States, where the judge or tribunal that has been the subject of contempt, and where the judge or tribunal has found the parties charged with the contempt guilty, the judge or tribunal finding the party guilty of contempt has been represented in the reviewing court. One can only say that, had Judge Walther exercised the same degree of care for ethical conduct in the court below that he has invoked in this court, there would not have been so much made, or to be made, out of this case, and we cannot help but think that the standing of the courts would have been better; that is, when this information was prepared and the parties were brought into court, if Judge Walther had referred the matter to one of his associates upon the bench and had given his statement as a witness rather than as a judge from the bench; but that is only a matter of taste, as we have already indicated.

Now the graveness of this case must be manifest to everyone. The editorials are in a measure vicious editorials but they are shaded down as the different editions appeared,—the first of the three above quoted being the harshest. They were in the nature of editorials addressed to the sheriff of Cuyahoga County, urging him to perform his duty; and that was brought about by reason of what seemed to be a vacillating condition on the part of the sheriff as to whether he would or would not allow horse racing where the the contribution system was to be used within the County of Cuyahoga, which had been a matter of discussion for days and perhaps weeks. The sheriff apparently stood upon one side and then upon the other and then, perhaps, upon neutral ground, and the editorials apparently were addressed to him.

Now a singular situation has arisen. This court, in the case of Euclid Kennel Club Company vs. E. J. Hanratty, decided September 6th, 1927, affirmed a judgment entered by Judge Weygandt of the Common Pleas Court holding that the contribution system as proposed to be carried out, was illegal and that it was gambling and in

violation of law. Judge Weygandt rendered a very able opinion holding this view and the case was ably argued in the Court of Appeals, and we affirmed the judgment of Judge Weygandt. How anybody can for a moment beguile himself into believing that by the contribution system, so-called, he can evade the gambling statute, is beyond the comprehension of the writer of this opinion. It is plainly an ingenious or rather a disingenious method of evading the statute by calling gambling by some other name. The parties who had become contributors of money on the outcome, or as has been naively suggested in the petition, "in the ultimate success or outcome of the horse," were just as much betting upon the success of that horse as they would have before any gambling statute was ever heard of.

I suppose the greatest evil that confronts our people to-day is the habit of gambling. It is the forerunner of crime. It is the breaking down of the morals of the people and many a young man,—and old man too, for that matter,—has been guilty of embezzlement and theft to cover up his shortage that he has lost on betting or gambling, and it was with that in mind that the legislature passed the anti-gambling statute, and it has been the aim of those who seek to profit by the weaknesses of their fellowmen to evade the enforcement of that statute, and one must say that the men who have those things in charge are very resourceful and have political influence, and apparently all of that influence and adroitness was used upon the sheriff to prevent him from enforcing the statute. As already stated, the sheriff had vacillated from one post to another, and we learn from this record that, on the 10th day of July, at two o'clock in the afternoon, a series of races were to be held at the Thistledown Track, and the contribution system was to be used, and apparently the sheriff had been told by the very able counsel connected with the Prosecutor's office that such a system was illegal and was prohibited by law and, as already stated, the Common Pleas Court and this Court had so held. Apparently those promoting the races had information that the sheriff had been led to see through the thin veneer of the so-called contribution system, and that he was going to call it gambling and was going to perform his duties and so, on the 10th day of July, although this thing had been brewing · for days and perhaps weeks, a lawyer appeared in court room number one, where Judge Walther was holding court temporarily to fill the assignment of some other judge while he was away a day or two, at twelve minutes before twelve o'clock, and Judge Walther was asked how long he expected to remain in court, and he said that he had an engagement to lunch with his daughter, who was in the court room, and that he would not stay later than twelve o'clock exactly. He was informed that a lawyer by the name of Felsman was drawing a petition

to enjoin the sheriff from interfering with the races on the Thistledown Track and that he would have it in before twelve o'clock and asked Judge Walther to wait. Before twelve o'clock, perhaps twelve minutes before, Mr. Felsman appeared together with his client Mr. Strong, who likewise was a lawyer at this bar, with a petition praying for an injunction to prevent the sheriff from confiscating the property to be used on the track, and to prevent the sheriff from stopping the races, or interfering in any way with the races being run under cover of the contribution system, together with other allegations in the petiton. Whereupon Judge Walther made some inquiries and said he would not grant the injunction in the form it was asked for in the prayers, but that he would grant the injunction if they would add certain things to three of the five prayers in the petition and, although the lawyers protested, they could not get an injunction any other way and so they finally wrote in what Judge Walther requested in three prayers of the petition, which are the most peculiar things that one ever saw in a petition. It then purported that an injunction had been issued and yet it left it with the executive officer of the County, the sheriff, to determine whether the acts to be done were legal or illegal. If they were illegal, then the sheriff was not to be interfered with; and if they were legal, then the sheriff was enjoined from interfering. It would be difficult in the annals of legal history to find such another order of injunction.

With all the · astuteness and learned ability of Mr. Baker only one case which is at all parallel to the instant case has been found, and that is the case of Charles M. Oliver, Respondent, vs. Allen C. Orrick, et al, appellants, 220 Missouri Appeal Reports page 614; 288 Southwestern, 966, which differs somewhat from the instant case, but is more clearly akin to it than any other case to which we have been referred or, judging from the statement of Mr. Baker, that he was able to find.

Now this was the situation on the 10th. Fortunately for Cuyahoga County it had a man who had been on both the Common Pleas and the Court of Appeals benches as the first assistant prosecuting attorney, Mr. Lieghley, and he at once saw through the so-called injunction and told the sheriff that the injunction was not worth the paper upon which it was written, and that he should go on and perform his duties, which the sheriff did, and went to the race track and closed up the races and all the horses and paraphernalia used in racing and betting was removed from the tracks. "They folded their tents like the Arabs, and quietly stole away."

Now this was the situation when the editorials, which were the basis of this contempt proceedings, were published by The Cleveland Press. The case, so far as Judge Walther had anything to do with it, was a thing of the past and was done away with. The answer day for the defendant

sheriff was a time several days after the closing of the proposed racing meet. Nothing else was ever done in that lawsuit; there was nothing else to do. The sheriff, if he was enjoined, treated the paper that had been served upon him as of no importance, as a mere blank piece of paper and, ignoring it, performed his duties.

Now the thought in the mind of the editor of the Press and of the editorial writer of the Press evidently was that here was a situation which called for strong remarks,—and one must admit that in the editorials they gave utterance to strong remarks,—but when one thinks of a judicial officer exercising the strong power of injunction to prevent an officer, elected and sworn to enforce the criminal law,— I say, when one thinks that a court grants an injunction against said officer performing his duty, one cannot help but think that such actions did call for strong remarks. I have been on the Common Pleas bench and I was asked many times to grant injunctions against the chief of police and others from enforcing the law. I always refused. There is no occasion to grant an injunction against an executive officer from enforcing the law that he is sworn to enforce. If the law is invalid, or if the parties arrested are not guilty of the violation of any law, they have a clear and adequate remedy at law; and there are but very few cases in the judicial history of the world, especially in the United States, where courts have transcended their power and issued injunctions to prevent the enforcement of a criminal statute. Our courts refuse to do it because the complainant has a clear and adequate remedy at law. Where there is likely to be a multiplicity of arrests and where there is a question as to the legality of the law, a court might grant an injunction to prevent a multiplicity of suits and arrests while it tries out one case to see whether the law is valid or otherwise. But beyond this, it is hardly conceivable that a court of equity should be called upon to issue such injunction.

It is said in this case that the Judge did not intend to issue any injunction; that he intended to make it appear only that an injunction was issued. Was this to befuddle the sheriff so that he would look at the heading of the petition and the prayer enjoining him, and then not molest, and rest upon the assumption that he had been enjoined? Was it a subterfuge, or was it a genuine injunction? We have no hesitancy in saying that, under the authority of Oliver vs. Orrick, supra, the act of the sheriff in going out and stopping the races and confiscating the property that was to be used in betting could not be held as being in contempt of the order issued by Judge Walther. The petition was so vague and so indefinite, leaving the decision of whether the acts were legal or illegal up to the sheriff, and it reminds one of an old pioneer who lived in the forest, in which forest roamed his cattle and likewise roamed deer; and so, when the pioneer would see something stir in the bushes, he would get his gun and aim it so as to hit it if it were a deer and miss it if it were a cow. So, apparently, in this case this injunction was aimed to enjoin if he interrupted the things that were legal, and not to enjoin if he interfered with things that were illegal, and the sheriff was to be the sole judge of the legality or illegality of the things that he was to stop or not to stop.

With such an injunction the one violating it could not be found guilty of contempt. Then the question follows whether the one who criticised such an order—no matter how severe the criticism might be— could not be found guilty of contempt. If it could not, then no matter how annoyed and hurt Judge Walther was, no matter how lacerated his feelings that made him sick and unable to transact business, it would not be contemptuous. He might, of course, if he were libeled or slandered, have his action against the newspaper for such recompense as he might be entitled to by reason of such libel or slander.

We live in an age of pitiless publicity! We live in an age when freedom of speech and freedom of press are paramount issues! People should be allowed to say what they please and newspapers should be allowed to print what they please, always making themselves liable under the law of slander or the law of libel, and usually this is penalty enough to keep persons from transcending the bounds of decency and proper criticism.

While courts must be protected in the administration of their judicial duties, yet courts are filled with men who are only human and they are subject to all the weaknesses and variable temperaments that beset the ordinary man, and because a man gets on the bench does not necessarily mean that he has changed his temperament or his liability to get excited; and if he can set himself above the rest of mankind and sit in judgment on grievances in which he is the injured party, we are establishing a dangerous precedent and I say, as I said before, courts should be very loath to transcend the rules allowed in such cases.

Now in the instant case one can readily understand how Judge Walther might have been hurt to the quick, might have been agonized in his mind by the criticisms that were made in the editorials in question, for we say they were severe, but perhaps no serverer than the circumstances warranted considering everything surrounding the entire transaction of which the public was perfectly cognizant for days and days before. We think that this contempt was not committed in the presence of Judge Walther, nor was it committed so near to the court that it interfered with the administration of justice. Judge Walther says in his statement that "it disturbed him and made him nervous, restless, agitated and sleepless." I can quite understand how that might be, and how that might interfere with the orderly administration of justice by **Judge Walther**; but that is not what the law means by

interfering with the administration of justice. If Judge Walther would have anything else that would upset him so that he would be nervous, agitated, restless and sleepless and thus interfere with the performance of his official duties,—and many such things do occur in men's lives,— yet no one would think that was interfering with the administration of justice in such a way that the man who caused this nervous, agitated, restless and sleepless condition would be guilty of contempt.

No, it must be interference with the administration of justice! The actions which are called contemptuous must be committed within the court room or so near to the court room that they interfere with the administration of justice.

In this case, so far as this action was concerned, Judge Walther's connection with it had ceased. He issued a temporary restraining order, such as it was, and then he went to his own room, and in all human probability he never would have had anything more to do with the case, but the record shows that, on the tenth this case became nothing more than a moot case, and the editorials of the Press referred to transactions that were past and, so far as Judge Walther was concerned, however aggrieved he might be, whatever claims he might have by reason of a libel against the Press, it did not constitute contempt of court within the meaning of the statute. The act was not committed in his immediate presence and it was not committed in the court room. He admits that in having the information drawn and the parties arrested and brought into court to answer to that information. Had it been a matter which he could have treated summarily, he need not have done either of those things. He could have written on his calendar an order of arrest for these men, without serving them with a copy and he could have brought them into court and summarily punished them. For example, if Seltzer and Matson had stood up in the court room and stated to Judge Walther personally what they had written in the first of the three editorials, Judge Walther would have been perfectly within his rights and within his power to have written on his calendar contempt charges, and could have had the men brought before him and could have summarily sent them to jail or fined them within the limits of the statute. But when he filed, or caused to be filed an information when the criticism was called to his attention by a member of the bar, he admitted that it was not a summary contempt; that it was not a matter which he could punish summarily for contempt; and then, the best that could be done with this matter, so far as he was concerned,—for the case was already disposed of; it was no longer a pending case so far as Judge Walther was concerned,—all that he could have done was to have pursued his remedy like any other man might have against the Press, and that was to sue it for libel, if it constituted libel.

I have been on the bench a great many years and I find that many things are said which tend to ruffle a person and to agitate him, but it is better for a judge to be ruffled and agitated than it is to close the mouth of the speaker to the public, for while it may transcend good taste and decency at times, usually the reaction is great upon the medium that has uttered uncalled-for criticisms and unjust statements; and the man against whom they are leveled passes unscatched if the criticisms are unjustified and he pays no attention to them. In other wordss, it is better that the Press be free, that speech be free, that the right of assembly be free, that the right to air our views be free, than it is that they be uttered in fear and trembling even though oftentimes they transcend the bounds of decency and of the rights of the individual assaulted. A free people must have a free press and they must have the right to speak freely their thoughts. They must have the right to meet in assembly and to discuss questions. Public men must always remember that they are subject to criticism, and when a public officer does an unworthy act that is uncalled for and unjust, he cannot expect other than to be criticised by the press and by the thinking people of the land, and the less he says about it, the better it will be for him and for the public. While Mr. Read thought he was doing Judge Walther a kindness in calling his attention to these editorials, the writer of this opinion thinks he did him the greatest unkindness that one man can do to another, for had Judge Walther ignored and forgotten about those matters the public would have soon forgotten it likewise. He put in concrete form what otherwise would have been evanescent. What otherwise would have been written on water, he has written in marble. It was, therefore, no kindness to Judge Walther to have caused him to institute these proceedings nor to have called his attention to it.

I cannot help but think that Judge Walther now realizes that, and that may have been the reason why he declined to have briefs filed and why he refused to permit the able counsel that he appointed to assist us in arriving at our conclusions. I cannot help but think that Judge Walther had come to the conclusion that he probably was in error and that he had acted hastily. If that is so—and I do not know whether it is or not—there was but one thing open to Judge Walther, and that was to instruct his counsel to come in the Court of Appeals, or to come himself and frankly state that he had made a mistake and ask the court to reverse the judgment rendered in his court and to discharge the plaintiffs in error. This was not done and so we had only the aid of Mr. Baker, and I do not say "only" in any invidious sense, because there is nobody better able to present the truth to the court nor more willing to aid the court, nor more fair to the other side of a lawsuit, than Mr. Baker, and that was demonstrated throughout this whole case.

We think the court erred in sitting in this case and in hearing the evidence, such as it was, for an information having been filed, he could have plainly sent it to another judge. We think he was not in a fit condition of mind to give an unbiased judgment and to weigh the matters with which he had to deal; that he lost sight of his position as a judge and sought to reek vengeance upon the plaintiffs in error because they had dared to criticise him in his official capacity.

I do not mind saying that the criticisms were unduly harsh. They were of a nature to incite most any man, and under those circumstances he ought to have consulted with the lawyers whom he afterwards appointed, before having rushed into an action from which he could not afterwards withdraw. Of course, had this been committed in the presence of Judge Walther, we admit that he had the power, the right and it was his duty to sit and punish the offender summarily for the contempt committed in his presence, nor do we have any sympathy with the cry that such contempts must be sent to other judges. To deny that power to a judge destroys the very efficacy and power of the court, which must have power to enforce obedience and order in his court and, if it is necessary to summarily punish for contempt for that purpose, he can do so; but that cannot be confused with the idea of having personal vengeance upon the part of the judge to gratify a whim or spite or an angry feeling he may have for persons who insult him outside and away from the court.

In this connection it is well to quote from the great bard of Avon:

"'O' it is excellent
To have a giant's strength; but it is tyrannous
To use it like a giant."

And again:

"And earthy power doth then show likest God's
When mercy seasons justice."

And Beaumont and Fletcher say:

"'Tis Godlike to have power, but not to kill."

So we think that the court erred in these respects: first, that these men did not and could not have had a fair trial, the court being guilty of abuse of discretion in hearing the case; we think the court erred likewise in the rendition of the judgment in this case, for he sent these men to jail for thirty days and fined them Five Hundred Dollars, when under the statute under which he acted the limit of his right to **imprison** was ten days in the county jail. That could, of course, be rectified, by sending the case back to Judge Walther for a modification or re-sentencing. Third, we think the court erred in treating these editorials as contemptuous in that he regarded the action as pending before him and the contempt committed as tending to interfere with the administration of justice. We think, so far as Judge Walther was concerned, that there was no pending action; that the whole matter had ceased and that he was no more than a stranger. We think, furthermore, that the so-called injunction was nothing more than a piece of paper that had no judicial order upon it whatever, and that nobody could be guilty of contempt for violating that "injunction" and, as a corollary from that nobody could be guilty of contempt in commenting upon that so-called order and in characterizing it in the strongest sense that it could be characterized. It was no order; it was nothing but a blank piece of paper. Whether it was designed for the purpose of befuddling the sheriff we do not know. Many sheriffs would have been befuddled with such a writ, but fortunately the sheriff had good legal advisers who told him plainly and succinctly that the order was not worth the paper upon which it was written, and if the order was not worth the paper upon which it was written, then how could a comment, however severe, upon the paper be a contempt? True, the comments might be libelous; true, they might subject the utterer of them and the paper that carried them to a suit for slander or libel and recovery of damages, but that is aside from the question.

We think from this whole record that the judgment of the court was not supported by sufficient evidence; that it was contrary to the evidence and that there was no evidence in this record to warrant the judgment of the court and, therefore, the judgment of the court will be reversed and the defendants Louis B. Seltzer and Carlton K. Matson discharged.

Sullivan and Levine, JJ., concur.